# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs at Knoxville October 15, 2013

## STATE OF TENNESSEE v. TROY LYNN FOX

**Appeal from the Criminal Court for Wilson County**
**No. 09-CR-523        David E. Durham, Judge**

---

**No. M2013-00579-CCA-R3-CD - Filed February 28, 2014**

---

The Defendant, Troy Lynn Fox, was convicted of the first degree premeditated murder of his wife and sentenced to life imprisonment. On appeal, the Defendant raises the following issues for our review: (1) whether the evidence was sufficient to sustain his conviction; (2) whether the trial court erred by admitting certain photographs into evidence—one, a photograph of the murder victim that was taken while she was alive and, two, multiple photographs of the crime scene and of the victim's injuries, taken both at the scene and during the autopsy; (3) whether the trial court erred by failing to conduct a jury-out hearing prior to the admission of several photographs of the victim taken at the crime scene and by describing those photographs as "gross" in front of the jury; (4) whether the trial court erred by requiring the Defendant to cross-examine the victim's mother during the State's case-in-chief rather than allowing the Defendant to recall her as a defense witness; (5) whether the trial court erred by prohibiting the Defendant from further development of the couple's social, family, and marital history; (6) whether the trial court committed reversible error in its instruction to the jury on the impeachment of a witness; and (7) whether the trial court demonstrated judicial bias against the Defendant.[1] Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and JEFFREY S. BIVINS, JJ., joined.

William M. Carter, Gallatin, Tennessee (on appeal); and J. Stephen Mills, Nashville, Tennessee (at trial), for the appellant, Troy Lynn Fox.

---

[1] For the purposes of clarity and brevity, we have renumbered and combined several of the Defendant's issues.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Tom P. Thompson, Jr., District Attorney General; and Brian W. Fuller and Linda D. Walls, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case arises from the brutal beating and strangulation of the Defendant's wife ("the victim") inside the couple's Mt. Juliet residence on June 30, 2009. Thereafter, a Wilson County grand jury returned a two-count indictment against the Defendant, charging him separately with first-degree premeditated murder and second-degree murder of the victim. At the outset of the Defendant's trial on September the 26th through the 28th of 2011, the State nolled the second-degree murder count, acknowledging that it was a lesser-included offense of the first-degree premeditated murder count. Trial proceeded on the first-degree murder charge.

The evidence presented at trial revealed the following facts. In the early morning hours of June 30, 2009, the Defendant placed a telephone call to 911, requesting emergency assistance for his forty-seven-year-old wife. At that time, the Defendant and the victim had two daughters, a five-year-old and a two-week-old, who were both present inside the home. According to the 911 operator, there was a period of silence "on the front end of [the] call[,]" which was unusual to her.

Timothy Owens, a firefighter paramedic with Wilson County Emergency Management, along with his partner, James Copas, responded to the call, arriving at the home at approximately 6:19 a.m. According to Owens, the Defendant informed them that he was in the kitchen when he heard a loud noise and thought that his daughter had knocked something over. The Defendant told Owens that, upon further investigation, he "found his wife at the bottom of the stairs flopping around" and that he tried to perform CPR on her but was unable to "get any breaths to go in[.]"

The paramedics found the victim at the bottom of a stairwell coming down from the house into the garage area. Owens testified that the victim was lying "on the landing, a large puddle of blood around her, and blood spatter at the bottom of the platform and off to the left and the right side of the platform on the wall." He further described that, in addition to the "very large area" of "solid blood" on the platform, there was three to four feet of blood spatter on the walls, floor, and a nearby child's chalkboard. "[G]iven the amount of blood on the ground, absence of a pulse and respirations, and the number of injuries [the victim] had, [which included] bruising around the eyes, bruising behind her right ear, and a large

-2-

laceration to the back of skull," they determined that the she was dead and contacted the medical examiner.

The Defendant went upstairs to care for the couple's newborn while the paramedics were tending to the victim. While Owens was waiting on the medical examiner, he went upstairs and had a conversation with the Defendant in an effort to gather biographical information about the victim. Owens described the Defendant's demeanor during this conversation: "His demeanor was very -- he was very calm, seemed like nothing was going on really, just like you would be talking to him on an[y ]other day, I would imagine. He seemed very detached."

Another description of the victim's injuries was given by Detective Chris Hodge of the Wilson County Sheriff's Department. In addition to the large cut on the back of the victim's head, Det. Hodge observed the following:

> She had a[n area of] large swelling and a cut under the right eye. She had several small cuts just around the facial area, nose, a lot of bruising. She had a lot of blood around the back of her head, of course, and her hair, her ears. Her arms had some small scrapes and cuts, and on the legs. Her back had several scrape marks.

Detective Jeff Johnson of the Wilson County Sheriff's Department arrived at the scene about 7:30 a.m. After being briefed on the situation, Det. Johnson approached the Defendant, and they conversed at the kitchen table. Det. Johnson detailed the conversation that ensued:

> I asked [the Defendant] in just the initial interview with him, I asked him what had happened, and he stated to me that his wife had been walking around the house. He didn't know exactly what she was doing. He was in the kitchen, he thought, possibly taking one of his vitamins. He heard something at the stairs leading down to the basement.
> He went to the door and found his wife laying at the bottom of the stairs. He advised me he went downstairs, found her. She was still breathing but she was jerky, having kind of jerky actions.
> . . . .
> . . . He then advised me that he opened up a door on his vehicle. He was planning on loading her into his vehicle to carry her to the hospital. He then realized that his two small children were still asleep upstairs. He then called 911. He tried to do CPR on her the best that he could, and he advised me -- his statement to me was, and I quote, it's not like --

. . . .

   . . . He made a statement to me and I quote, it wasn't like doing CPR on
a practice dummy.  That was what [the Defendant] had advised me.  He then
waited on the ambulance to get there and then once the ambulance got there
that's pretty much when our statement ended.

   The Defendant did not mention to Det. Johnson anything about an argument between
the couple that morning or about any pending divorce proceedings.  When asked about the
Defendant's demeanor during the conversation, Det. Johnson replied, "He really showed no
emotions.  Whenever I would ask him a question, he would just kind of look off away from
me and never would make eye contact with me.  And his hands were visibly shaking, but
there was no emotion that he showed at all."

   Brody Kane, the lawyer who was representing the victim in the couple's divorce,
testified about the pending proceedings.  He advised his client to delay the divorce until the
baby was born and to stay inside the marital residence.  On March 2, 2009, Mr. Kane filed
several documents initiating divorce proceedings against the Defendant—a complaint for
absolute divorce, a proposed temporary parenting plan, a temporary injunction, and a
discovery request.  The Defendant was served with the those documents on March 18, 2009.
During the representation, the victim sent Mr. Kane a letter, which included a blog written
by the Defendant, and this blog "scared" the victim according to Mr. Kane.  Following the
victim's death, Mr. Kane provided law enforcement with information regarding the pending
divorce.

   Amy McMaster, an employee of Forensic Medical Management Services, performed
an autopsy of the victim on July 1, 2009.  Dr. McMaster was recognized as an expert in
forensic pathology without objection, and she testified about the victim's many injuries to
her head and body, which included "a large gaping laceration" on the back of the victim's
scalp.  This large laceration to the back of her head was inconsistent with a fall and was
likely "from more than on blow to the back of head, either something hitting the head or the
head being repeatedly hit against something else."  Additional lacerations reflected "blunt
trauma to the head[,]" and several of the victim's injuries were consistent with being punched
according to Dr. McMaster.  Dr. McMaster also observed injuries to other parts of the
victim's body—arms, elbows, back, legs, and feet.  When asked if the victim's injuries were
consistent with a fall down the stairs, Dr. McMaster said,

   Not all of the injuries taken together as a constellation.  Could one or two or
   a few of these injuries be caused from a fall down the stairs, yes.  But when all
   of the injuries taken together over all of her body, those injuries taken together

are not consistent with simply a fall down the stairs. There is other trauma involved.

In addition to the victim's other injuries, Dr. McMaster also determined that the victim had been strangled. Dr. McMaster testified that, upon preforming a dissection of the victim's neck, she observed the following:

> When I did that on [the victim] she had hemorrhages or bleeding in the muscles in the front of the neck, so they are several layers of muscles deep, and in those muscles there were hemorrhages that indicates some type of force applied to the neck. She also had hemorrhage surrounding a small bone in the neck called the hyoid bone and, again, that indicates some type of constricting force around the neck.
> It could be hands. It could be some other type of object[] that's used as a ligature. It could be a foot or a shoe compressing the neck. It just indicates some constrictive force around the neck that indicates strangulation.

When asked how long it would take to strangle someone, Dr. McMaster responded,

> Well, it depends. If someone is unconscious, obviously you could do it a lot faster than if they were alive and struggling and fighting. I think probably all things being equal, two people in a struggle, one strangling the other, it's going to take minutes in order to make someone unconscious and eventually dead from strangulation.

In conclusion, Dr. McMaster opined that the victim's cause of death was "multiple blunt force injuries and strangulation" and that the manner of death was "homicide."

Dr. McMaster informed law enforcement of her findings. Thereafter, detectives obtained a search warrant for the couple's home. At approximately, 6:00 p.m. on July 1, 2009, they executed that warrant, observing that the steps had been cleaned up, with pieces of the wall, steps, landing, and carpet gone, and seizing three computers from the home.

Special Agents Brian Harbaugh and Russ Winkler of the Tennessee Bureau of Investigation (TBI) also interviewed the Defendant that same day, July 1, around 1:00 p.m. The Defendant was informed that they wanted to speak to him about the victim's death, that he had a right to an attorney, and that it was a non-custodial interview, meaning he could leave at any time. The Defendant first told the agents that he was in the kitchen, when he heard a "loud bang coming from what the thought to be the stairs." He described, "[I]t sounded like maybe someone was coming down the steps too fast." After checking on the

-5-

baby, he found his wife at the bottom of the stairs, convulsing and lying in a large amount of blood. "He said he was trying to hold her down, hold her chest down. He said that she was trying to get up. He said that he could see that there was blood from the back of her head, there was blood on the stairs, the floor and on her as well." During this first version, the Defendant claimed he was holding the victim down so as to not wake the children. He contended that he went to the truck and intended to take the victim to the hospital, but remembering that the children were inside, he instead went upstairs and telephoned 911. He also told the agents that "he had washed his hands" and "changed his shirt" before calling 911. According to Special Agent Harbaugh, the second time the Defendant told the agents "about initially seeing her and going down to get closer to her, he stated that he shut the door . . . behind him[.]" Special Agent Harbaugh found this behavior—shutting the door, changing clothes, and washing hands—"very odd" and inconsistent with a typical response of someone attempting to render aid to a loved one. According to Special Agent Harbaugh, the Defendant "was calm" as he relayed this first tale of events.

The Defendant also told Special Agent Harbaugh about a website he had called "cavertroy or cavetroy.com" devoted to caving or spelunking, where he "had posted several statements concerning his wife basically saying derogatory things towards her, curse words, calling her names." The Defendant said, that after the victim's death, "he went to that site and removed those statements and took the site down."

Special Agent Harbaugh confronted the Defendant with the autopsy findings and his story changed. He then gave the following version:

> [The Defendant] at that point began saying that it was an accident, that it wasn't on purpose. We asked him to further explain to us what he's talking about. He stated that when he initially ran down the steps that he was -- the same thing, attempting to hold her down because he said she was trying to get up.
> He said that she was breathing but she wasn't talking. He explained to us again that there was a lot of blood, and he said that in an attempt to calm her down, he was punching her in the face. As he's stating this, he has his fist balled up, his right hand just balled up in a fist.
> . . . .
> . . . And we asked him if he could tell us how many times. He said he couldn't tell us exactly how many times, just that it was more than once that he punched her in the face. He went on to say that after that she was still moving around, and at that point he had taken her head, again, demonstrating with his hands, he said that he had taken her head and slammed it off the -- when you come down the step there's a metal plywood -- I'm sorry, there's a

-6-

plywood landing that gives you the option to go to the right or the left. It's kind of elevated from the concrete floor.

He stated that he had banged her head off the plywood floor several times and then he had shifted her, which would be to left, and banged her head off the center block wall several times.

The agents told the Defendant that they believed this version. They asked the Defendant what brought about these actions, but "he would not tell [them] that." Det. Harbaugh stated that he did not recall the Defendant mentioning any other incident involving the couple's children during the interview, other than the Defendant's desire not to wake them. When pressed for further clarification of how this happened, the Defendant left the interview and did not sign a written statement. According to Special Agent Harbaugh, during this second version of events, the Defendant "was upset. He was very upset. He was crying. He was very emotional. I'd say emotional to angry."

Special Agent Winkler also described the Defendant's demeanor during the interview. According to Special Agent Winkler, during the first version of events, the Defendant was "[j]ust very calm, no emotion. . . . [H]e just simply looked down that whole time, never making eye contact with [the agents], just explained this first story without any emotion." The Defendant's demeanor changed during the second version according to Special Agent Winkler: "[H]e was a little more animated but there was still no -- he didn't seem to me to be remorseful, although he said it was an accident, it wasn't done on purpose. But it just didn't seem genuine, his remorse in that."

TBI Special Agent Nicholas Christian examined the computers seized from the Defendant's home and testified as an expert in the area of computer forensics. He retrieved multiple email correspondence between the Defendant and the victim over a period of some months, reflecting frustration and dissatisfaction in their relationship, largely due to the Defendant's desire for more children, their difficulties during the in vitro fertilization process to conceive their second child, and the victim's impression that the Defendant was only interested in more children and not interested in her. Special Agent Christian also found a document called "divorce venting," where the Defendant addressed his frustrations with the victim who wanted to go skiing while pregnant, their pending divorce, and the proposed parenting schedule. He wrote,

You want to know what I've been going through? Me, a man who has always wanted kids. . . . trapped which a psycho who has physically abused my daughter and is trying to sabatage [sic] the child in her womb. And now SHE's going to divorce ME and furthermore is trying to force my daughter to

go 12 days in a row without seeing her father. Then a quick weekend and then 12 more days apart.

I can't even type what's in my mind now. I'm not that stupid.

12 years military. I've been backing off cliffs on a rope since I was 17. I have self control, more than she knows, more than she will ever suspect. I will wait patiently and carefully and choose the time and place of my vengeance. I am a merciful man but I will show no mercy to the one that seeks to harm my children or separate me from them.

Don't take me too seriously. I'm just venting, 'No baby, thass [sic] jus [sic] jokes, haa-haa, yeah haa-haa.' Eddie Murphy."

In a blog titled "Tired of Holding it in" taken from the Defendant's website, the Defendant again expressed his frustration and dissatisfaction with the victim and their relationship, complaining about the victim's poor self esteem, her hitting their older daughter in the face, and other issues relating to her inability to be a good wife and mother. The Defendant's website was last accessed on June 30, 2009, at 12:42 p.m. according to Special Agent Christian.

Lori Reynolds knew the Defendant and the victim from church. After the Defendant gave Mrs. Reynolds's husband "a calling card" with the Defendant's website information on it, she and her husband went to that site and saw some of the Defendant's derogatory references to the victim using "angry-type language." Ms. Reynolds testified, "There was -- I remember there was an entry that talked about nobody's going to get in between me and my kids, nothing can come between me and my kids." After Ms. Reynolds learned of the victim's death, she went to the website but "those blogs, journals" had been removed. Ms. Reynolds contacted the Mt. Juliet Police Department and told them about the website postings.

Brenda Shaw, a Servpro employee, was responsible for the cleanup at the couple's residence following the victim's death, performing these services on the afternoon of June 30, 2009. Ms. Shaw described that there "was a pool of blood" on the landing which had to be cleaned up, "plus cut out some steps." In addition to the blood on the landing, there was blood on the railing and the steps and "blood droppings around a vehicle" that stopped at the passenger-side door according to Ms. Shaw. This scene was bloodier than the approximately twenty other biohazard scenes Ms. Shaw had cleaned up; those being mostly suicides.

The Defendant presented David Wantland, who examined the stairs at the couple's residence at the Defendant's request. Mr. Wantland, who had designed stairs and railings since 1973, determined that the couple's stairs were not uniform in size and that there was

not an adequate railing as required by the applicable building code. Mr. Wantland opined that he did not consider the stairs to be safe.

The Defendant then testified on his own behalf. In addition to providing lengthy background information about himself and the couple's relationship, he described the weeks leading up to the victim's death. He testified about his concerns regarding the victim's treatment of their newborn. He also acknowledged that the victim had filed for divorce and that they were sleeping in separate bedrooms. The Defendant stated that he had filed a counter complaint for divorce and a parenting plan, wherein he sought joint custody of the children.

According to the Defendant, on the morning of June 30, 2009, he was discussing reconciliation with the victim when she "dropped" the baby, stating that the baby was all the Defendant cared about. The Defendant continued,

> I mean, she was literally like laying her down but she dropped her, and then she turned and she was walking off and I bent over [the baby]. I was bending over looking at her and she came and pushed me out of the way and was holding me back. I grabbed her and the door is right there and I just strong armed her and opened the door. I was thinking I wanted her out of the house. I didn't want her in the house with the kids.

According to the Defendant, they were struggling as he was pushing her, and the victim fell down the steps into the garage. He testified that he went to help her, and she slapped him the face. According to the Defendant, he "just lost it." The Defendant admitted to punching the victim repeatedly in the face and head and bashing the victim's head against the landing of the stairs. He claimed he "meant to hurt her[,]" but he did not "mean to kill her[.]" He further stated that he "regret[ted] killing her[.]"

Following the conclusion of proof, the jury returned a verdict of guilty as charged, and the trial court imposed a sentence of life imprisonment. This appeal followed.

## ANALYSIS

On appeal, the Defendant raises the following issues for our review: (1) whether the evidence was sufficient to sustain his conviction; (2) whether the trial court erred by admitting certain photographs into evidence—one, a photograph of the murder victim that was taken while she was alive and, two, multiple photographs of the crime scene and of the victim's injuries, taken both at the scene and during the autopsy; (3) whether the trial court erred by failing to conduct a jury-out hearing prior to the admission of several photographs

of the victim taken at the crime scene and by describing those photographs as "gross" in front of the jury; (4) whether the trial court erred by requiring the Defendant to cross-examine the victim's mother during the State's case-in-chief rather than allowing the Defendant to recall her as a defense witness; (5) whether the trial court erred by prohibiting the Defendant from further development of the couple's social, family, and marital history; (6) whether the trial court committed reversible error in its instruction to the jury on the impeachment of a witness; and (7) whether the trial court demonstrated judicial bias against the Defendant. We address each in turn.

## I. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence supporting his conviction for first degree premeditated murder. After citing the law relative to the standard of appellate review for sufficiency of the evidence, the Defendant makes the following one-sentence argument attacking his conviction:

> Relying upon all of the foregoing argument, [the Defendant] contends that the evidence presented during his trial failed to prove beyond a reasonable doubt that at the time of the offense he possessed the necessary intent or premeditation to sustain a conviction for first degree murder, and that his conviction should be reversed.

The State responds that the evidence presented at trial sufficiently established the element of premeditation, noting the Defendant's prior internet writings showing his ill-will toward the victim; the blood spatter evidence and the evidence of multiple blunt force injuries to the victim, suggesting the attack was sustained for some period of time; and the evidence of manual strangulation, an act that took minutes to accomplish before death occurred.

Initially, we observe that we could deem this issue waived for the Defendant's failure to adequately brief his sufficiency argument. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Nonetheless, the State does not argue waiver of the issue, and given the severity of the crime and because the evidence of premeditation is relevant to other issues in this appeal, we will address whether the evidence was sufficient to establish the premeditated and intentional nature of the killing.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all

conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

First degree murder, in this instance, is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

"[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d).

The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing

the crime, destruction or secretion of evidence, and calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Further, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

The Defendant does not deny that he caused his wife's death but argues that he lacked any intent to kill her. Viewed in a light most favorable to the State, we conclude that the evidence presented at trial was sufficient for a reasonable jury to find the Defendant guilty of the premeditated first degree murder of his wife. The evidence reflects that the Defendant and the victim were involved in a contentious divorce, that the Defendant was obsessed with his children, and that he feared that the victim might gain custody of them. The Defendant made veiled threats against the victim in his internet correspondence. The autopsy results indicated that the victim's cause of death was "multiple blunt force injuries and strangulation" and that the manner of death was homicide. The Defendant admitted that he punched the victim with his fists multiple times in the face and head, and he also recalled bashing her head against the landing at the base of the stairs. There was a significant amount of blood and blood spatter at the crime scene, and there was no evidence that the victim was armed. Importantly, in addition to severely beating the victim, the Defendant strangled her death, which the medical examiner stated would "take minutes" to accomplish and that "during that course of minutes . . . [a person] would have to apply consistent force upon that person's neck in order to strangle them to death[.]" According to officers and emergency personnel at the scene, the Defendant appeared relatively calm after the incident. By his own admission, the Defendant went upstairs and washed his hands and changed his shirt before calling 911. Immediately following the killing, the Defendant removed his derogatory comments about the victim from his website. Given this evidence, we conclude that it was reasonable for the jury to find that such actions evinced a premeditated intent to kill the victim. See, e.g., State v. Hill, 333 S.W.3d 106, 133-34 (Tenn. Crim. App. 2010) (concluding that evidence was sufficient to support a first-degree premeditated murder conviction where the defendant beat the unarmed victim with the lid to her toilet tank; defendant admitted carrying the lid from bathroom into the living room in preparation for the argument with the victim; the defendant inflicted multiple, vicious blows upon the unarmed and prone victim that crushed not only her skull but her brain itself; evidence indicated that the victim was still alive when the defendant subsequently placed dog leash around her neck, with strangulation a contributing cause of death; the defendant coolly lied about his presence at the victim's home just after killing; and the defendant went to great lengths to conceal killing).

-12-

## II. Photographs

The Defendant next makes numerous challenges to the admission of certain photographs at trial. His issues with these photographs are both substantive and procedural and in nature.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. See State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; Banks, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Id. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. Id. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. Id. at 949; see also State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

### A. "Life Photo"

The Defendant argues that the trial court erred by allowing the State to introduce into evidence a "life photo" of the victim. The first witness at trial was Marjorie Allen, the victim's mother, through whom the State introduced a photograph of the victim taken shortly before her death. The Defendant acknowledges that he made no contemporaneous objection at trial, raising the issue for the first time at the motion for new trial. See Tenn. Crim. App. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection). While acknowledging the waiver at the motion for new trial hearing, counsel[2] stated he was attempting to preserve the issue for purposes of appeal, noting that the issue of admissibility of this type of photograph was pending disposition before the Tennessee Supreme Court in State v. Prince Adams, No. W2009-01492-CCA-R3-CD, 2011 WL 4375332, at *5-6 (Tenn. Crim. App. Sept. 21, 2011), perm. app. granted, (Tenn. Feb. 15, 2012).

On appeal, the Defendant acknowledges that our supreme court has issued its opinion in State v. Adams, 405 S.W.3d 641 (Tenn. 2013), and the holding therein does not provide

---

[2] The Defendant was represented by a different attorney at the motion for new trial hearing.

him with relief. As such, he concedes that his issue is waived for failure to make a contemporaneous objection at trial. We agree that the issue is waived and that Adams does not provide the Defendant with plain error relief because review of the issue is not necessary to do substantial justice as the error would be deemed harmless. See 405 S.W.3d at 656-68 (concluding that it was error for trial court to admit the portrait-style photograph of murder victim for the purpose of showing the existence of a life-in-being, but the error was harmless because it had no effect on the results of the trial).

### B. Crime Scene Photographs

As a procedural issue regarding the admission of photographs, the Defendant argues that the trial court erred by failing to conduct a jury-out hearing prior to the admission of several photographs of the victim taken at the crime scene and by describing those photographs as "gross" in front of the jury. The State responds that the Defendant failed to make a contemporaneous objection to the trial court's consideration of the photographs in the presence of the jury, thus, waiving the issue. Waiver notwithstanding, the State submits that the Defendant has failed to show that the trial court violated any rule or acted in such a way as to prejudice the jury.

At trial, Timothy Owens, a firefighter paramedic with Wilson County Emergency Management, testified that he responded to the call at the couple's residence on June 30, 2009. Owens provided details to the jury concerning his observations of the victim's body when he first arrived on the scene, describing the victim's injuries, the amount of blood present, and the blood spatter. He verified the authenticity of several photographs depicting his testimony which were admitted into evidence—one, a photograph of the residence; the next, a photograph of the garage leading to the stairwell; the next, a photograph of the victim's entire body as discovered in the stairwell; and the next two, pictures of the blood spatter present at the scene.

The State next sought to introduce three close-up photographs of the victim's injuries through Owens. The State showed Owens the first two photographs and asked him to describe their contents. Owens replied, "That's [the victim] with the bruising around her eyes, puddle of blood on the floor. And this picture here you can see mild bruising behind the ear, right ear." The State asked that those be entered into evidence. The following exchange then occurred:

> [DEFENSE COUNSEL]: Your Honor, I object to those pictures.
> THE COURT: State your objection, [defense counsel].
> [DEFENSE COUNSEL]: Your Honor, I don't believe they would serve any
> purpose other than shocking the jury.

THE COURT: Pass them up here and let me look at them, please. General, what is your response?

[PROSECUTOR]: Your Honor, these photos are obviously needed to show the jury how [the victim] was found that day. This goes to his testimony, the injuries that he saw and the amount of blood, and the injuries that he's described, Your Honor. I think the jury needs the full picture. This is part of the picture.

THE COURT: [Defense counsel], of course in a charge such as this, the State does have a certain burden. That burden, Number 1, they must prove that the crime was intentional. It's a heavy burden. Also they must prove premeditation which is a very heavy burden,

I do find that these photographs both have probative value which outweighs their value as being overly for lack of a better word, gross, but I do believe the probative value outweighs the prejudicial effect because of the nature of the charge and what the State does need to prove, so I'm going to overrule your objection.

Nothing in the transcript reflects that this colloquy occurred at the bench or out of the hearing of the jury.

The two photographs—one of the victim facing to the right and the other of the victim frontal facing—were then marked and admitted as exhibits to Owens's testimony. Owens then testified about a third photograph of the victim, which showed a laceration to the back of her head, and this photograph was admitted into evidence without objection.

Crime scene photographs of a victim tend to be prejudicial by nature, but this fact does not make them excludable per se. Adams, 405 S.W.3d at 658 (citing State v. Jordan, 325 S.W.3d 1, 86 (Tenn. 2010)). Moreover, our supreme court has permitted "photographs of [a victim's body] . . . in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Id. (quoting Banks, 564 S.W.2d at 950-51). The trial court here found that the photographs were relevant to the issue of the Defendant's premeditation and intent and that their probative value outweighed any gruesome or horrifying character. That the trial court described the photographs as gross was simply an acknowledgment of their character, a fact which cannot be denied. The trial court's comments addressed the ruling it was required to make under the Rules of Evidence before admitting the photographs into evidence, i.e., whether the probative value of the two photographs was substantially outweighed by their danger of unfair prejudice to the Defendant. See Tenn. R. Evid. 403. The trial court cannot be said to have abused its discretion by admitting the pictures into evidence.

The Defendant's main issue with these crime scene photographs concerns the fact that no hearing was held outside of the jury's presence on their admissibility and that the jury was prejudiced by hearing the trial court's comments. The State correctly notes that nothing in Rule 403 specifically requires that a jury-out hearing be held. We agree with the Defendant that a better practice is to have a hearing outside the presence of the jury, as acknowledged by the trial court at the motion for new trial hearing.[3] However, we also agree with the State that responsibility for the error lies with defense counsel who failed to make a contemporaneous objection. See State v. Ernest Gentry Burton, No. M2008-00431-CCA -R3-CD, 2009 WL 2382284, at *14 (Tenn. Crim. App. Aug. 3, 2009) (holding that defendant was not entitled to relief when trial court ruled on the admissibility of a State's witness's prior inconsistent statement in the presence of the jury when defense counsel made no request otherwise). If defense counsel chooses to argue in front of the jury that the photographs are inadmissible due to their "shocking" nature, he must surely be aware that the trial court may disagree, also in the presence of the jury. See id. We conclude that the trial court did not err when it made the aforementioned comments.

We further agree with the State that any error in this regard is harmless as the evidence was properly held to be admissible. See Bolton v. State, 591 S.W.2d 446, 449 (Tenn. Crim. App. 1979) (trial court permitted introduction of shotgun prior to ruling on its admissibility; and although the better practice is to display and tender the evidence outside of the jury's presence if in doubt, this court found no error under those circumstances because the evidence was later properly admitted). Accordingly, the Defendant is not entitled to relief on this issue.

*C. Autopsy Photographs*

Next, the Defendant contends that the trial court erred by admitting into evidence multiple photographs of the victim's injuries taken by the medical examiner, Dr. Amy McMaster, during the autopsy. The Defendant submits that prior to the admission of these photographs, the State had introduced

> nineteen (19) photographs showing the injuries to the victim and/or the crime scene, one (1) autopsy report, and one (1) diagram depicting the various injuries to the victim. In light of the photographs and documentary evidence

---

[3] The trial court judge also noted at the motion for new trial hearing that his normal practice was to hold a jury-out hearing on the admissibility of photographs, making the following statement:

> I just cannot recall ever having a hearing on specific pieces of evidence that were objectionable until I've had an opportunity to look at it, and I look at it without the jury sitting there, unless it was done here at the bench with my microphone turned off where the jury is unaware of it.

-16-

introduced prior to Dr. McMaster's testimony, the probative value of the photographic evidence objected to by [the Defendant] was low, and the danger of unfair prejudice to [the Defendant] was high, resulting in error.

The State first notes that the trial court considered each photograph individually, asking Dr. McMaster in each instant why the photograph was necessary to explain her testimony, prior to allowing the photographs to be admitted. The State then argues that the photographs established that the victim suffered a sustained string of injuries over her body, showing that the Defendant acted with premeditation and intent, and that the photographs are not overly inflammatory. Accordingly, the State contends that the trial court did not abuse its discretion in admitting the various photographs.

In the present case, the trial court admitted seventeen photographs of the victim at the autopsy over the Defendant's objection, in addition to the diagram prepared by Dr. McMaster and her autopsy report. The trial court first reviewed each photograph. Following this review, the trial court found nine of the photographs were admissible, finding that they were not "particularly inflammatory," and Dr. McMaster responded affirmatively to the trial court's questions that those photographs were needed to explain her diagnosis. She did not provide specifics regarding this set of photographs. Regarding the remaining eight photographs, the trial court found that those were likewise relevant but were "of a different character of the body[.]" The trial court then asked Dr. McMaster to review each of those eight photographs and specifically address why that photograph was necessary to explain her diagnosis. Following this colloquy between Dr. McMaster and the trial court, the trial court asked for the prosecutor's response to defense counsel's objection to each of these eight photographs, and the prosecutor argued that each photograph depicted the Defendant's intent. The trial court ruled on the admissibility of these eight photographs as follows:

> Well, you know, we all know, all the evidence that's presented in any criminal case by the prosecution is prejudicial. It's designed to be. It all goes to develop and show the State's theory of what happened in a particular instance.
> Of course the State's theory in this particular case is that the victim suffered from multiple -- a beating and the slamming of the head down a staircase, and the fact the fall down the staircase in itself was not accidental.
> Now, I think I believe I mentioned this to the jury during voir dire, there's some stuff you just can't sterilize. . . .
> I don't think there's any question in any type of homicide case that when you're describing the victim's body, photographs are the best evidence. There's no question. Of course, it still raises the issue, well, are these photographs -- does their prejudicial value outweigh the relevance.

In other words, is there a way to explain to the jury, which would be just as effective as the pictures themselves and letting the jury know exactly what is alleged to have happened on June 30, 2009. Now, of course the photographs I've already admitted into evidence previously, I don't believe are that inflammatory.

As I stated earlier, I think the photographs I've discussed with Dr. McMaster, they're not as pleasant to look at, but first degree murder is not a pleasant situation. The State does, as stated earlier, has a very heavy burden in this case.

Number 1, they must prove that this killing was intentional. They must prove that it was done with premeditation. In other words, that [the Defendant] thought about it before committing the act, even if for just a brief period of time. And there's a difference between looking at injuries on a piece of paper and looking at those actual injuries.

. . . There's just no way to sanitize these cases without taking from the trier of fact, which in this case is the jury, the true ability to determine what happened on that particular day. There's just no other way to do it.

So, looking at the other photographs, the ones that I've discussed with Dr. McMaster, I do specifically find that their relevance, in order to explain premeditation, in order to explain intent, that the relevance does outweigh the prejudicial value in this particular case because of the heavy burden placed upon the prosecution in order to prove those particular elements.

So, I'm going to admit all the photographs which have been submitted . . . .

Autopsy photographs must never be used "solely to inflame the jury and prejudice them against the defendant" and must be relevant to prove some material aspect of the case. Banks, 564 S.W.2d at 951. Again, our supreme court has permitted "photographs of [a victim's body] . . . in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Adams, 405 S.W.3d at 658 Id. (quoting Banks, 564 S.W.2d at 950-51). Moreover, this court has held that "photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." State v. Derek Williamson, M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011) (citing Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)).

The Defendant claimed that the killing was not planned and that he snapped following the victim's actions towards their newborn and the stressors of the divorce. The photographs were highly probative of the nature of the victim's injuries, the repeated number of the injuries, and the location of the wounds. The State was required to prove the element of

-18-

premeditation. Among the factors probative of premeditation are the particular cruelty of the killing and infliction of multiple wounds. Jackson, 173 S.W.3d at 409; Nichols, 24 S.W.3d at 302. The autopsy photographs were highly probative of these circumstantial indicators of premeditation. In sum, the State and the Defendant presented opposing theories regarding the Defendant's alleged intent, and the photographs had significant probative value in helping the jury determine what actually happened in the couple's residence that day. In addition, while some of the photographs in question were graphic, they were not particularly gruesome, as the victim's body had been cleaned. We cannot conclude that the trial court abused its discretion in determining that the autopsy photographs were relevant to issues presented at trial and that their probative value was not substantially outweighed by the danger of unfair prejudice. See, e.g., State v. Andre Harris, No. W2011-02440-CCA-R3-CD, 2013 WL 2424115, at *10-11 (Tenn. Crim. App. June 5, 2013) (finding no abuse of discretion in the trial court's admission of twenty autopsy photographs).

### III. Presentation of Victim's Mother

The Defendant contends that the trial court committed error by denying his request to recall the victim's mother as a defense witness. The State responds that the Defendant offers no argument to suggest that he was prejudiced by the trial court's actions in any way and, therefore, has not shown entitlement to relief.

As noted above, the victim's mother was the State's first witness, and she provided the jury with biographical information about the victim. After direct examination of the victim's mother was completed, defense counsel stated, "Your Honor, I have no questions for this witness at this time, however, I have her on my witness list. I'll be calling her as part of my case." A bench conference then ensued:

> THE COURT: [Defense counsel], I don't believe in keeping family members out unless you've got a very, very good reason. Why would you save her for rebuttal and not use her now on cross-examination when you have the right to use leading questions? What would you expect to ask her as your witness that you can't ask her now?
> [DEFENSE COUNSEL]: I just was anticipating that we're going to go over her testimony in further detail.
> THE COURT: Well, you do it now on cross, because I'm not going to let a family member sit outside just on the chance you might use her. That's not proper. But now if you have some relevant questions you'd like to ask, then you need to ask them now, otherwise I'm going to let her remain in the courtroom.
> [DEFENSE COUNSEL]: Yes, sir.

Defense counsel then questioned the victim's mother about her knowledge of her daughter's acting career. Once questioning was completed, the victim's mother was allowed to remain in the courtroom. No formal objection was lodged; the Defendant never attempted to recall the victim's mother; and the issue was not raised until the motion for new trial. In discussing the issue at the motion for new trial, counsel agreed with court that "the order of witnesses [was] a prerogative of the trial judge." As additional grounds for denying relief, the trial court noted in its ruling: "[Defense counsel] still had the opportunity to recall this witness, but had he examined the witness or did a cross-examination, he would have been given more leeway than as his own witness because he could have asked leading questions and gone into other material."

On appeal, the Defendant cites to no other law than providing the standard of review for such issues. After summarizing the procedural history of the issue, he simply argues "the trial court's refusal to allow his attorney to recall the witness in [the Defendant's] defense was an abuse of the court's discretion and therefore constitutes error." The State correctly notes that the Defendant makes no real argument as to how he was affected by the alleged error. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.")

Nonetheless, it is well-settled that "the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to review for abuse of discretion." State v. James, 315 S.W.3d 440, 460 (Tenn. 2010) (citations omitted); see also State v. Barnard, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994). The trial judge is vested with authority to determine the order in which witnesses may be examined and the time at which the examination will occur. State v. Wiseman, 643 S.W.2d 354, 366 (Tenn. Crim. App. 1982) (citing 98 C.J.S. Witnesses § 317, p. 12). The trial court's exercise of discretion may not be reversed unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn.1997). Clearly, family members of a murder victim have an interest in being present during the trial of the alleged murderer. See TENN. CONST. art. I, section 35; Tenn. Code Ann. §§ 40-38-301, -302 (Victim's Bill of Rights) (definition of victim includes parent of deceased victim). The trial court inquired of defense counsel if he had a good reason for waiting to call the victim's mother as a defense witness. The Defendant was unable to provide a reason other than "we're going to go over her testimony in further detail." As an additional benefit to the Defendant, he was allowed to ask leading questions on cross-examination of the witness. The Defendant has failed to demonstrate that the trial court abused its discretion in denying his request to reserve his examination of the victim's mother until the presentation of his defense. For these reasons, the Defendant is entitled to no relief on this issue.

*IV. Further Evidence of Couple's History*

As his next assignment of error, the Defendant argues that "the trial court erred in not allowing [him] to develop [the couple's] social, family and marital history during periods of time prior to the morning of the victim's death." He submits that this testimony would have provided "evidence of his lack of intent or premeditation in the death of his wife, and the trial court's refusal to allow such evidence constitutes reversible error." The State provides an examination of the record and notes that the trial court did allow the Defendant "some leeway" in describing the history of the marriage and that he was able to provide much of this testimony, just not all that he desired. Moreover, the State continues that the Defendant "fails to state exactly what more he might have offered the court regarding this history which would have been relevant to the issue of premeditation." Finally, the State argues that the Defendant has failed to state a proper basis for relief because he "fails to support his claim with any citation to case law, rule or statute, or to even explain how any more information about his social, family or marital history would have been helpful to a determination of the facts."

The Defendant testified in his own defense. At the outset of his testimony, he provided extensive biographical details about his family history and upbringing, his education and employment history, his military career, his first marriage and dating history, and his hobbies. He also discussed his desire for children and how he met the victim in 2002 on a ski trip. He then talked about the early history of the relationship, detailing their courtship. When the Defendant began to discuss their sexual relations and his previous contraction of a sexually transmitted disease, the State objected on relevancy grounds: "Now there's some background that needs to be laid, but this is kind of extensive." Defense counsel responded, "I think the relevance here, this couple's history is very much relevant to the problems that arose in the relationship that led to us being here." The trial court ruled,

> Well, [defense counsel], I do agree. I think that the couple's history, particularly during the event that this alleged to have happened -- we've just now got that far. Let's kind of move on and get to the meat of this, and I'm going to give you some leeway but let's kind of move to what we're here about. Let's talk about that.

The Defendant continued his testimony, providing details about his children, his age and the victim's age, the victim's first pregnancy, his intentions to have children and his discussions with the victim in that regard, and the victim's acting career. When the Defendant was asked "What type of actress are you referring to?", the State again objected to the relevance of the testimony. After defense counsel's argument, the trial court sustained the objection with regard to that question and gave the following admonishment to defense counsel:

-21-

I've given you a lot of leeway but so far all your questions have been open ended which has allowed [the Defendant] to testify open ended. I'm going to sustain the [State's] objection at this point. You need to ask questions which are relevant to why we're here today. These open ended questions are just not getting us there, okay. So, I'm going to sustain the objection this time.

Defense counsel then inquired about the couple's difficulties during this early period of the marriage, which immediately drew another relevancy objection. Again, the trial court sustained the objection, concluding,

2003, I believe is a little bit too far removed unless you talk about later events, closer to the event as to why we're here. And then give you an opportunity to maybe tie them together, but I'm not going to let you go through a year by year history with [the Defendant]. Let's get to why we're here. And like I say, if you can work backwards from that and ask relevant questions which will tie into the events around this particular date, I'll let you ask them. But at this point, I'm going to sustain them, and let's get closer to the events of why we're here today.

The Defendant then began to provide details regarding the events leading up to June 30, 2009, testifying about the pending divorce, custody issues, alleged child abuse by the victim, the couple's living arrangements, and care for the couple's newborn. The Defendant was asked his opinion about the victim's care of the newborn, which drew a speculation objection. The trial court ruled that the Defendant could relay his own observations of the victim and the child but that it would not be allowed to "go real far." The Defendant then relayed his observations for the jury.

Questioning turned to the Defendant's internet writings. When asked about his motives behind the writings, he stated that during the victim's first divorce, she withdrew and had a nervous breakdown. This response again drew an objection, which the trial court sustained on hearsay grounds, and the trial court again admonished, "Let's kind of get to the end of it. Let's get to the end of it." The Defendant then stated that the purpose of the writings was to scare the victim.

The Defendant continued his explanation of the writings. When asked about his statements that he was a patient man and that he would exact vengeance, the Defendant responded with details about the injunction in place during the divorce and how the victim would move their belongings around despite this order. The State again lodged a relevancy objection, to which the trial court responded, "[Defense counsel], I've given you a lot of leeway, a lot of leeway. I've asked you two or three times already. You've asked some

-22-

relevant questions, but you[’ve] gotten some very irrelevant answers. Let’s try to keep it on that line.”

Although the Defendant details his testimony in the trial court and the various objections lodged by the State in his appellate brief, the Defendant does not provide this court with any citation to case law, rule, or statute on how these rulings of the trial court were in error. He notes that these “[d]ecisions regarding the admission or exclusion of evidence are entrusted to the trial court’s discretion” and then provides the standard of review. He cites to two cases for the standard of review—one of those cases provides the standard for hearsay objections and the other for relevancy issues. This is the extent of his citations to legal authorities. The Defendant makes only a blanket statement that his additional testimony on these subjects would have provided “evidence of his lack of intent or premeditation in the death of his wife” but provides no further explanation. We agree with the State that the Defendant has waived review of the issue for failing to state a proper basis for relief. See Tenn. Ct. Crim. App. R. 10(b) (“Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.”) Moreover, the Defendant never made an offer of proof of what additional information he might have offered regarding the couple’s history that would have been relevant to the issue of premeditation. See Tenn. R. App. P. 36(a).

He does seem to suggest that the trial court limited his presentation of this evidence because it was not relevant to any issue at trial. At the motion for new trial hearing, the trial court found that the previous rulings were proper, reasoning, “The [c]ourt felt then and the [c]ourt feels now that much of even what the [c]ourt did allow was totally irrelevant, but I gave the opportunity to the [D]efendant to get to the point and a point was never reached until I did sustain the State’s objection.” The trial court allowed the Defendant to provide an abundance of testimony on his background and on his history with the victim, just not to the Defendant’s complete satisfaction. No abuse of discretion occurred entitling the Defendant to relief.

*V. Jury Instruction on Impeachment of a Witness*

The Defendant argues that the trial court committed reversible error in its instruction to the jury on the impeachment of a witness. A defendant has a “constitutional right to a correct and complete charge of the law.” State v. Litton, 161 S.W.3d 447, 458 (Tenn. Crim. App. 2004) (quoting State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990), superseded by statute on other grounds as stated in State v. Reid, 91 S.W.3d 247, 291 (Tenn. 2002)). When reviewing challenged jury instructions, we must look at “the charge as a whole in determining whether prejudicial error has been committed.” In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987) (citation omitted); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). “A charge should be considered prejudicially erroneous if it

fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing State v. Forbes, 918 S.W .2d 431, 447 (Tenn. Crim. App. 1995); Graham v. State, 547 S.W.2d 531 (Tenn. 1977)). Because questions regarding the propriety of jury instructions are a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001).

In the present case, the trial court issued the following instruction on the impeachment of a witnesses:

A witness may be impeached by proving that he or she has made some material statements out of court which are at variance with his or her evidence on the witness stand. However, proof of such prior inconsistent statements may be considered by you only for the purpose of testing the witness's credibility and not as substantial evidence of the truth of the matter asserted in such statements.

Further, a witness may be impeached by a careful cross-examination involving the witness in contradictory, unreasonable and improbable statements. However, immaterial discrepancies or differences in the statements of witnesses do not affect their credibility unless it should plainly appear that some witness has willfully testified falsely.

When a witness is thus impeached the jury has to disregard his or her evidence and treat it as untrue except where it is corroborated by other credible testimony or by the facts and circumstances proved on the trial.

The instruction that should have been given was that, "[w]hen a witness is thus impeached, the jury has the right to disregard his or her evidence and treat it as untrue . . . . " See T.P.I.—Crim. 42.06 (Impeachment of witness).

We must agree with the parties that the instruction as given was in error.[4] Thus, our analysis of this issue will be limited to whether the Defendant is entitled to reversal of his conviction and a new trial based on the erroneous jury instruction. The Defendant submits that the erroneous instruction "disturbed the integrity of the jury as a fact-finding body[,]" removing from the jury its "right" to determine the Defendant's credibility, and instead instructing the jury to per se disregard the Defendant's testimony because he had been impeached. Therefore, the Defendant argues that this error constitutes a "structural

---

[4] We note that the trial court made no challenge to the court reporter's transcription of the jury charge. We also observe that the word "substantial" is used in the instruction as transcribed and that the correct word from the pattern instruction is "substantive."

-24-

constitutional error," not amenable to harmless error review, which requires automatic reversal. The States argues that the error "did not deprive the [D]efendant of his right to a jury trial or to constitutional due process, and is subject to harmless error review."

Identifying the proper standard is important because the standards for evaluating the harmfulness of non-constitutional error and constitutional error differ markedly. State v. Climer, 400 S.W.3d 507, 569-70 n.18 (Tenn. 2013). In conducting harmless error analysis, our supreme court has identified three categories of error: (1) structural constitutional error; (2) non-structural constitutional error; and (3) non-constitutional error. State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008); see also Climer, 400 S.W.3d at 569. We find guidance from this court's opinion in State v. Paul Wallace Dinwiddie, Jr., No. E2009-01752-CCA-R3-CD, 2010 WL 2889098 (Tenn. Crim. App. July 23, 2010), perm. app. denied, (Tenn. Oct. 15, 2010), on the application of these standards to the varying types of jury instruction error:

> The United States Supreme Court and, to some extent, the supreme court of this state have examined jury instruction errors on a continuum of error, finding some errors so profound as to defy harmless error analysis while finding some more akin to other garden variety trial errors. At the beginning of this continuum, we find the complete deprivation of a public jury trial, which has been deemed structural error not subject to harmless error analysis. See Waller v. Georgia, 467 U.S. 39, 49 (1984). Similarly, some jury instruction error, error which strikes at the very heart of an accused's right to trial by jury and which "categorically vitiat[es] all the jury's findings," Hedgpeth v. Pulido, 555 U.S. 57, 61 (2008) (citations and internal quotation marks omitted), is also structural error. See Sullivan v. Louisiana, 508 U.S. 275, 281 (1993). In Sullivan, the Court determined that "where the instructional error consists of a misdescription of the burden of proof, which vitiates all the jury's findings," the error was not subject to harmless error analysis because "[a] reviewing court can only engage in pure speculation—its view of what a reasonable jury would have done."[5]  Id. Structural errors

---

[5] The Court concluded that the erroneous reasonable doubt instruction given at Sullivan's trial violated both the Sixth Amendment jury trial right as well as the Fifth Amendment guarantee of due process:

> It is self-evident, we think, that the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated. It would not satisfy the Sixth Amendment to have a jury determine that the defendant is probably guilty, and then leave it up to the judge to determine (as Winship requires) whether he is guilty beyond a reasonable doubt. In other words, the jury verdict required by the

(continued...)

"'defy analysis by 'harmless-error' 'standards' because they 'affec[t] the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.'" United States v. Gonzalez-Lopez, 548 U.S. 140, 148-49, (2006) (quoting Arizona v. Fulminante, 499 U.S. 279, 309-10 (1991)). "But 'structural errors' are 'a very limited class' of errors that affect the 'framework within which the trial proceeds,' such that it is often 'difficul[t]' to 'asses[s] the effect of the error." United States v. Marcus, 560 U.S. 258, 263 (2010) (citations omitted).

More common in the continuum are those jury instruction errors that do not equate to a complete deprivation of the right to trial by jury but nevertheless seriously implicate both the right to trial by jury and, in many instances, the right to a fair trial, which is a component of constitutional due process. See Hedgpeth, 555 U.S. at 60 (observing that "various forms of instructional error are not structural but instead trial errors subject to harmless-error review"). In Hedgpeth, the Court observed that the omission of an element of an offense, see Neder v. United States, 527 U.S. 1 (1999), the giving of an erroneous aider and abettor instruction, see California v. Roy, 519 U.S. 2 (1996), the misstatement of an element of an offense, see Pope v. Illinois, 481 U.S. 497 (1987), and the erroneous burden-shifting as to an element of an offense, see Rose v. Clark, 478 U.S. 570 (1986), had all been subjected to constitutional harmless error analysis. See Hedgpeth, 555 U.S. at 60-61. Errors in this category require reversal unless the error can be deemed "harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."). "Indeed, [the Court has] said that 'if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred' are not 'structural errors.'" Marcus, 560 U.S. at 265 (quoting Rose, 478 U.S. at 579). These errors "'occur[] during presentation of the case to the jury' and their effect may 'be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt.' These include 'most constitutional errors.'" Gonzalez-Lopez, 548 U.S. at 148-49 (quoting Fulminante, 499 U.S. at 306-08). When considering this category of error, a

_____

[5](...continued)

Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt.

Sullivan, 508 U.S. at 278.

reviewing court "should ask whether the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.'" Hedgpeth, 555 U.S. at 58 (citing Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (internal quotation marks omitted in original)). As the Court explained,

> Consistent with the jury-trial guarantee, the question it instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks, we have said, to the basis on which "the jury actually rested its verdict." The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.

Sullivan, 508 U.S. at 279 (citations omitted).

At the far end of the continuum are those instructional errors that do not rise to the level of a deprivation of either the right to trial by jury or constitutional due process. "The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but 'the fundamental elements of fairness in a criminal trial.'" Rivera v. Illinois, 556 U.S. 148, 158 (2009) (quoting Spencer v. Texas, 385 U.S. 554, 563-64 (1967)). The Court recognized that "errors of state law do not automatically become violations of due process," particularly where "there is no suggestion . . . that the trial judge repeatedly or deliberately misapplied the law or acted in an arbitrary or irrational manner." Rivera, 556 U.S. at 160 (citations omitted).

Dinwiddie, 2010 WL 2889098, at *10-11 (footnote in original). For non-constitutional errors, a defendant challenging a conviction has the burden of demonstrating that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); Rodriguez, 254 S.W.3d at 371-72.

The instruction given in this case created a risk that the jury would disregard a witness's entire testimony if that witness had been impeached. This error, which impacts the Defendant's jury trial rights and rights of confrontation, we believe can best be classified as a non-structural constitutional error. See Marcus, 560 U.S. at 264 ("We see no reason why, when a judge fails to give such an instruction, a reviewing court would find it any more difficult to assess the likely consequences of that failure than with numerous other kinds of

instructional errors that we have previously held to be non-structural . . . .”) (internal quotation marks omitted)). Therefore, we apply the following harmless error standard to this erroneous instruction: “[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.” Chapman, 386 U.S. 18 at 24. When considering this category of error, a reviewing court “should ask whether the flaw in the instructions ‘had substantial and injurious effect or influence in determining the jury’s verdict.’” Hedgpeth, 555 U.S. at 58 (citing Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (internal quotation marks omitted in original)).

The Defendant reviews his testimony and notes that the Defendant “was successfully impeached by the State.” He cites to his testimony that he did not mention to Det. Johnson that he and the victim had a disagreement that morning, nor did he mention the divorce; that he admitted he lied to Det. Johnson; and that he did not mention to Det. Harbaugh that the victim had hurt his newborn that morning, nor about any argument. He continues,

> But for the erroneous jury instruction, the jury, in its discretion, could have found that [the Defendant] did not act with the specific intent to harm [the victim], or that he lacked the required premeditation. . . . Because of the erroneous jury instruction, the jurors were not allowed to consider [the Defendant’s] explanation of events, thus leaving the only proof in the case as that of the State. Had the jury been allow to consider the testimony of [the Defendant], it could have found

him guilty of a lesser-included offense. The State aks us to look at the jury charge as a whole and determine that the error was harmless.

The trial court gave the following additional instructions to the jury on how to consider certain testimony. First, the trial court instructed the jury on the credibility of witness as follows:

> Credibility of a witness defined: That quality in a witness’s testimony which renders the witness worthy of belief or not. It is your job to decide what the facts of this case are. You must decide which witnesses you believe and how important you think their testimony is.
> You do not have to accept or reject everything a witness says. You are free to believe all, none or part of any person’s testimony. In deciding which testimony you believe, you should rely on your own common sense and everyday experience.
> There is no fixed set of rules for judging whether you believe a witness. Sometimes the testimony of different witnesses will not agree and you must

decide which testimony you accept. You should think about whether the disagreement involves something important or not, and whether you think someone is lying or is simply mistaken.

People see and hear things differently and witnesses may testify honestly but simply be wrong about what they thought they saw or remembered. It is also a good idea to think about which testimony agrees best with the other evidence in the case.

However, you may conclude that a witness deliberately lied about something that is important to how you decide the case. If so, you may choose not to accept anything that witness said. On the other hand, if you think the witness lied about some things but told the truth about others, you may simply accept the part you think is true and ignore the rest.

You are the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony. If there are conflicts in the testimony of the different witnesses you must reconcile them if you can without hastily or rashly concluding that any witness has sworn falsely, for the law presumes that all witnesses are truthful.

In forming your opinion as to the credibility of a witness, you may look to the proof, if any, of his or her general character, the evidence, if any, of the witness's reputation for truth and veracity, the intelligence and respectability of the witness, his or her interest or lack of interest in the outcome of the trial, his or her means of knowledge, the reasonableness of his or her statements, his or her appearance and demeanor while testifying, his or her contradictory statements as to material matters, if any are shown, and all the evidence in the case tending to corroborate or to contradict him or her.

See T.P.I—Crim 42.04, 42.04(a). The trial court then gave the disputed instruction on impeachment of a witnesses, followed by the instruction on direct and circumstantial evidence. Thereafter, the trial court provided the jury with instructions on how to consider the Defendant's testimony and his prior admissions or statements:

The Defendant having testified in his own behalf, his credibility is determined by the same rules by which the credibility of other witnesses are determined, and you will give the Defendant's testimony such weight as you may think it is entitled.

If you find from the testimony of a witness or witnesses that there has been evidence of an admission introduced in this case, you may consider that evidence in your deliberations. It is the State's contention that an admission is an acknowledgment by the Defendant of certain facts which tend, together with other facts, to establish guilt.

-29-

It is your decision to decide whether the Defendant made an admission, and if so, does it tend together with other facts, to establish his guilt. It must be corroborated by other independent evidence to warrant and support a conviction.

The [c]ourt has permitted admission of this evidence but it remains your duty to decide if in fact such an admission or admissions were ever made. If you do not believe it was ever made, you should not consider it. If you decide it was made, you then must judge the truth of the facts stated.

In determining whether you should find it as true, you should consider the circumstances under which it was made. You should also consider whether any of the other evidence before you tends to contradict it in whole or in part.

You should not arbitrarily disregard any part of the admission, but you're to consider all of which statement you believe is true. If you find the statement is true, you are the sole judge of the weight that should be given it. You should consider it along with all the other evidence in the case in determining the Defendant's guilt or innocence. An admission is a voluntary acknowledgment that something is true.

Evidence of a statement by the Defendant has been introduced in this case. The statement has been introduced by the State as evidence against the Defendant alleging that the statement proves the Defendant engaged in conduct which constitutes the crime charged, and is an acknowledgment of guilt itself.

The [c]ourt has ruled that the statement is admissible in evidence, but it is your duty to judge its truth. In so judging, you should consider the circumstances under which the statement was obtained as well as any evidence which contradicts all or part of the statements made.

You must consider all the statements made by the Defendant, whether favorable or unfavorable to him, and you must not disregard any of them without good reason. If the evidence in the case leads you to believe that the statement, or any part of it, is untrue or was never made, you should disregard it or that portion which you do not believe.

You are the sole judge of what weight to be given to those portions of the statement which you do believe, and you should consider them along with all the other evidence in the case in determining the Defendant's guilt or innocence. A statement is the act of stating or declaring that person's recollection of a past event or occurrence.

See generally T.P.I—Crim. 42.04, 42.11, 42.11(a).

A jury instruction must be reviewed relative to the instructions in their entirety and read as a whole rather than in isolation. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). The complained of instruction dealt with how to treat an impeached witness, not how to treat an impeached defendant. The instruction dealing with the Defendant stated that his credibility was to be determined "by the same rules by which the credibility of other witnesses are determined[.]" Despite the error in the impeachment charge, the trial court repeatedly instructed this jury on how to consider a witness's testimony and that it was there job alone to determine its credibility. The trial court also specifically instructed the jury at length on how to deal with the Defendant's testimony and his prior admissions and statements, allowing the jury to accept or reject all or parts on these statements as they so choose.

Moreover, after our review of the record, we are convinced that the proof of premeditation was overwhelming in this case. The Defendant made declarations of his intent to kill, the victim was unarmed, the killing was particularly cruel, involving multiple blunt force injuries and strangulation, he secreted evidence, and he appeared calm immediately after the killing. Reading this jury charge as a whole and in light of the evidence of premeditation in this case, we conclude that the jury's guilty verdict was "surely unattributable" to the erroneous jury instruction and, thus, harmless beyond a reasonable doubt. Compare State v. Vernon Motley, No. W2010-01989-CCA-R3-CD, 2012 WL 1080479, *4-6 (Tenn. Crim. App. Mar. 29, 2012) (trial court erred in giving an expanded charge on premeditation, but such error was harmless beyond a reasonable doubt due to overwhelming proof of premeditation), perm. app. denied, (Tenn. Aug. 16, 2012), with State v. Hollis, 342 S.W.3d 43, 52 (Tenn. Crim. App. 2011); State v. Kenneth Spencer, No. W2010-02455-CCA-R3-CD, 2011 WL 6147012, at *13 (Tenn. Crim. App. Dec. 8, 2011); State v. Elgie Sykes, No. W2009-02296-CCA-R3-CD, 2011 WL 2732660, at *8 (Tenn. Crim. App. July 14, 2011) (all three cases remanding for a new trial, concluding that although sufficient evidence of premeditation, error was not harmless beyond a reasonable doubt).

*VI. Judicial Bias*

The Defendant contends that the overall "tone of the proceedings as established by the court's conduct throughout the trial constituted judicial misconduct of such a magnitude as to deny [him] his due process right to a fair trial." The State argues that this issue must fail because the Defendant has failed to adequately brief the issue. Alternatively, the State contends that the record does not establish judicial bias.

It has long been settled that "all litigants are entitled to the 'cold neutrality of an impartial court' and have a right to have their cases heard by fair and impartial judges." Wright v. Pate, 117 S.W.3d 774, 778 (Tenn. Ct. App. 2002). Moreover, a trial judge should

not express any thought that would lead the jury to infer that his opinion was in favor of or against a defendant in a criminal trial. State v. Harris, 839 S.W.2d 54, 66 (Tenn. 1992) (citing Brooks v. State, 213 S.W.2d 7, 10 (Tenn. 1948)). However, the various rulings of the trial court on the admissibility of evidence and the propriety of cross-examination and argument were only an exercise of the discretion accorded to the trial court in conducting the trial. Id. (citing Hamilton v. State, 555 S.W.2d 724, 728 (Tenn. Crim. App. 1977); Pique v. State, 480 S.W.2d 546, 548 (Tenn. Crim. App. 1972)). When reviewing a claim of bias, "[a]ny comments made by the trial court must be construed in the context of all the facts and circumstances to determine whether a reasonable person would construe those remarks as indicating partiality on the merits of the case." Alley v. State, 882 S.W.2d 810, 821-22 (Tenn. Crim. App. 1994) (citations omitted).

In the present case, the Defendant asserts that he was denied a fair trial by the various comments and interjections of the trial judge. He points to several incidents which he says cumulatively support his charge of judicial bias:

> In support of his contention, [the Defendant] relies upon comments made by the trial court, several of the court's rulings, and the court's restrictions on his right to recall the State's witnesses, Marjorie Allen. He further relies upon the court's failure to allow him to fully and completely develop his social, family and marital history during his testimony, as indicating the court's bias against him.

In concluding this section of his brief, the Defendant "submits that the trial court, as evidenced by the foregoing grounds for relief on appeal, conducted the trial in a manner showing bias in favor of the State, and that his conviction should be reversed."

In ruling on this allegation at the motion for new trial, the trial court determined as follows:

> I do remember this trial, and just because the [c]ourt sustains or overrules objections, that in no way gives an overall tone of the proceedings. In fact, if you were to go look at my admonitions to any jury, because I do this to every jury when I'm doing my own voir dire in seating them, I specifically, Number 1, instruct the jury, don't pay any attention to what I do here on this bench because nothing I do, nothing I write, if I pick up a pen, it has no effect on what I think your verdict should be, and that's also put in the instruction.
> As [defense counsel] did point out, jurors, I think, do read instructions, and part of those instructions are, they decide this case, not the [c]ourt, and I think they followed that instruction. So, I'm overruling that.

-32-

As noted by the State, the Defendant's allegation of bias is overly broad, and he fails to specify the comments of the trial court that he claimed prejudiced him or cite to the record where such instances of bias occurred. The Defendant merely cites to adverse rulings by the trial court on the admissibility of evidence and the propriety of cross-examination, which as noted in the law above, were only an exercise of the discretion accorded to the trial court in conducting the trial. The mere fact that the trial judge did not rule in favor of the Defendant in every instance does not equate to judicial bias. Rulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification. Alley, 882 S.W.2d at 821.

Additionally, regardless of the deficiencies in the Defendant's brief, an examination of the entire record establishes that the trial court did not conduct the trial in a manner showing bias in favor of the State. As addressed in the sections above, we have found no reversible error in the rulings of the trial court. Moreover, the trial court did instruct the jury that neither its rulings nor "any other remarks" were to be considered by the jury as indicative of the trial court's opinion on the facts of the case or a proper verdict of guilt or innocence; that such issues were solely their responsibility. We conclude that the Defendant has failed to show that the trial court acted inappropriately during the trial, and we discern no judicial misconduct. In so much as the Defendant argues that the trial court's demeanor and conduct denied him due process of law, we conclude based on our review of the record that the trial court exhibited no judicial bias. The Defendant is not entitled to relief on this issue. See, e.g., State v. Darrell Anderson, No. W2008-00188-CCA-R3-CD, 2010 WL 1444319, at *14-15 (Tenn. Crim. App. Apr. 9, 2010) (defendant's broad claims of judicial misconduct and due process of law based on allegedly prejudicial comments of the trial court in the presence of the jury were without merit).

## CONCLUSION

In accordance with the foregoing reasoning and authorities, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE